---

Ex parte KING.

(District Court, E. D. Kentucky, at Covington. September 24, 1917.)

1. WAR ☞32—MILITARY AUTHORITIES—JURISDICTION TO TRY OFFENSE.

Act Aug. 29, 1916, c. 418, § 3, 39 Stat. 650 (Comp. St. 1916, § 2308a), which supplanted Rev. St. § 1342, prescribed new articles of war. Article 92 declares that any person subject to military law, who commits murder or rape, shall suffer death or imprisonment for life, as a court-martial shall direct, but no person shall be tried by court-martial for murder or rape committed within any state of the Union or the District of Columbia in time of peace; while article 93 declares that any person subject to military law, who commits manslaughter, mayhem, arson, etc., shall be punished as a court-martial may direct. Article 58 of the original articles of war declares that, in time of war, larceny, robbery, murder, etc., shall be punishable by the sentence of a general court-martial when committed by persons in the military service of the United States. A soldier, after declaration that a state of war existed between the United States and Germany, killed a policeman of a Kentucky city. *Held*, that the military authorities had superior jurisdiction of the offense.

2. WAR ☞32—JURISDICTION—WAIVER.

Where the captain and major of a soldier who shot and killed a policeman of a city delivered him into the custody of the civil authorities, and on his examining trial consented that such civil authorities should pro-

ceed with the case, such consent, having been hastily given, was not, as against the commanding officer of the brigade of which the soldier was a member, a waiver of the preference right of the military authorities to try him: there being no presumption that the captain and major acted with authority.

Petition by Simson King for a writ of habeas corpus to secure the release of George King, committed by the County Judge of Campbell county, Ky. George King, the party in custody, directed delivered to military authorities.

W. C. G. Hobbs, of Lexington, Ky., for petitioner.
Thos. D. Slattery, U. S. Atty., of Covington, Ky., for the United States.

COCHRAN, District Judge. This is a writ of habeas corpus that is before me. It was issued upon the petition of Simon King, father of George King, the person held in custody. He is so held by the jailer of Campbell county, in this district, to whom the writ was directed, upon a charge of murder. He was first committed by the county judge of that county upon an examining trial, and since then he has been indicted by the grand jury thereof for that offense. He is a private in Company C, Second Kentucky Infantry, National Guards, and subject to military law, as provided by article 2 of Articles of War, section 2308a, United States Compiled Statutes 1916, p. 3949, and has been since April 13, 1917. The person whom he is charged with murdering was Christopher Kolhoven, then a policeman of the city of Newport, in that county. It is charged that he did so on July 11, 1917. The claim is that the killing took place on one of the streets of that city, and that it was not done in the performance of any duty as a soldier.

On July 28, 1917, the captain of his company preferred the charge against him of having committed the crime of murder, and Gen. Roger D. Williams, commander of the brigade to which the Second Kentucky Infantry belongs, has filed an intervening petition, praying that the prisoner be delivered to the military authorities, to be tried by a court-martial on the charge so preferred against him. The commonwealth of Kentucky has appeared by the commonwealth's attorney of Campbell county, and resists the delivery of the prisoner to the military authorities. The prisoner claims that the killing was committed by him in the performance of his duty as a soldier. The time of the killing was a time of war. The United States has been in a state of war with Germany since April 6, 1917.

The question which the case presents for consideration is whether the Campbell circuit court has jurisdiction now to try him for the offense for which he has been indicted. It is not whether it had jurisdiction to indict him and may not hereafter have jurisdiction to try him. It is not necessary to determine this question at the present hearing. The question before me may be narrowed to that stated, to wit: Whether that court has jurisdiction to try him under existing conditions, and to that end to withhold his custody from the military authorities.

[1] The solution of the question depends upon the true construction of the articles of war in force at the time of the killing. They are to

be found in section 3, c. 418, 39 Stat. 650, being Act Aug. 29, 1916 (U. S. Compiled Stat. 1916, § 2308a), which takes the place of section 1342, U. S. Rev. Stat. It is thereby provided that section 1342 be amended to read as therein provided. It is well to approach its pertinent provisions from the viewpoint of how the matter stood under section 1342 as it formerly was and here from the viewpoint of how it stood in time of peace. It stood then, as under the present statute, differently in time of war from what it stood in time of peace, and we are only concerned as to how it stood and stands in time of war. But it will aid in understanding how it stood and stands in time of war to understand first how it stood and stands in time of peace.

By section 1342 before it was thus amended a soldier of the United States army could be court-martialed in time of peace for offenses committed by him in violation of the criminal laws of a state or of the United States. Such jurisdiction was conferred by article 62. Thereby jurisdiction was conferred of "all crimes not capital, and all disorders and neglects, which officers and soldiers may be guilty of to the prejudice of good order and military discipline." Under this article a capital crime could be dealt with only as a disorder or neglect prejudicial to good order and military discipline. In re Stubbs (C. C.) 133 Fed. 1012. A case where such jurisdiction was exercised is that of the soldier who attempted to kill the assassin, Guiteau. Ex parte Mason, 105 U. S. 696, 26 L. Ed. 1213.

The jurisdiction so conferred, however, is not exclusive, but is concurrent with that of the civil courts. Grafton v. United States, 206 U. S. 333, 348, 27 Sup. Ct. 749, 51 L. Ed. 1084, 11 Ann. Cas. 640; Franklin v. United States, 216 U. S. 559, 30 Sup. Ct. 434, 54 L. Ed. 615. And by article 59 the civil courts were given priority in the exercise of jurisdiction. It was thereby provided that:

"When any officer or soldier is accused of a capital crime, or of any offenses against the person or property of any citizen of any of the United States, which is punishable by the laws of the land, the commanding officer, and the officers of the regiment, troop, battery, company, or detachment to which the person so accused belongs are required, except in time of war upon application duly made by or on behalf of the party injured, to use their utmost endeavors to deliver him over to the civil magistrate and to aid the officers of justice in apprehending and securing him, in order to bring him to trial."

As the requirement was that the officers specified should so do "except in time of war," this provision had application only to time of peace; and by virtue thereof in time of peace the military authorities were bound to give way to the civil. But this was not the only jurisdiction conferred on courts-martial of offenses against the criminal laws of a state. By article 58 they were given other jurisdiction thereof, but it is expressly limited to time of war. That article is in these words:

"In time of war, insurrection, or rebellion, larceny, robbery, burglary, arson, mayhem, manslaughter, murder, assault and battery with an intent to kill, wounding, by shooting or stabbing with an intent to commit murder, * * * or assault and battery with an intent to commit rape, shall be punishable by the sentence of a general court-martial when committed by persons in the military service of the United States, and the punishment in any such case shall not be less than the punishment for the like offense by the

laws of the State, Territory, or district in which such offense may have been committed."

It has been held by the Supreme Court in the case of Coleman v. Tennessee, 97 U. S. 509, 24 L. Ed. 1118, that, where an offense covered by this article is committed in time of war in enemy country, the military authorities have exclusive jurisdiction of the offense. There, in time of the Civil War, a federal soldier had committed the crime of murder in the state of Tennessee whilst it was in the military occupation of the United States, with a military governor at its head, appointed by the President, and, as there held, enemy's country. It was held that the soldier was not amenable to the laws of that state after it ceased to be enemy's country upon the close of the Civil War. This position was based upon the principles of international law, and not on the interpretation of the statute. Though the question was not involved therein, Mr. Justice Field considered how the matter would have been, had the crime been committed in a loyal state, which is the case we have here. It was held that it would have been otherwise. He said:

"But the section does not make the jurisdiction of the military tribunals exclusive of that of the state courts. It does not declare that soldiers committing the offenses named shall not be amenable to punishment by the state courts. It simply declares that the offenses shall be 'punishable,' not that they shall be punished by the military courts; and this is merely saying that they may be thus punished. Previous to its enactment the offenses designated were punishable by the state courts, and persons in the military service who committed them were delivered over to those courts for trial; and it contains no words indicating an intention on the part of Congress to take from them the jurisdiction in this respect which they had always exercised. With the known hostility of the American people to any interference by the military with the regular administration of justice in the civil courts, no such intention should be ascribed to Congress, in the absence of clear and direct language to that effect. We do not mean to intimate that it was not within the competency of Congress to confer exclusive jurisdiction upon military courts over offenses committed by persons in the military service of the United States. As Congress is expressly authorized by the Constitution 'to raise and support armies' and 'to make rules for the government and regulation of the land and naval forces,' its control over the whole subject of the formation, organization, and government of the national armies, including therein the punishment of offenses committed by persons in the military service, would seem to be plenary. All we now affirm is that by the law to which we are referred, the thirtieth section of the Enrollment Act, no such exclusive jurisdiction is vested in the military tribunals mentioned. No public policy would have been subserved by investing them with such jurisdiction, and many reasons may be suggested against it."

It will be noted that the considerations upon which he based the conclusion that the military jurisdiction conferred was not exclusive as to a loyal state in time of war were what the article did not provide and what it did. It did not provide that "the offenses named shall not be amenable to punishment by the state courts," nor did it provide "that they shall be punished by the military courts." What it did provide was that they should be "punishable" thereby, which was merely "saying that they may be thus punished." But it did not follow, from the position that the jurisdiction in such a case was not exclusive, but concurrent with that of the civil courts, that the military au-

thorities did not have the prior right in the exercise of jurisdiction. On the contrary, Mr. Justice Field recognized that they did have such prior right. He said:

"Persons in the military service could not have been taken from the army by process of the state courts without the consent of the military authorities; and therefore no impairment of its efficiency could arise from the retention of jurisdiction by the state courts to try the offenses. The answer of the military authorities to any such process would have been, 'We are empowered to try and punish the persons who have committed the offenses alleged, and we shall see that justice is done in the premises.' Interference with the army would thus have been impossible; and offenses committed by soldiers, discovered after the army had marched to a distance, when the production of evidence before a court-martial would have been difficult, if not impossible, or discovered after the war was over and the army disbanded would not go unpunished. Surely Congress could not have intended that in such cases the guilty should go free."

Indeed, it is an unescapable implication from the exception in article 59 of time of war from its requirement that the officers thereby referred to shall deliver an accused soldier to the civil authorities, if in their power to do so, and, if not, shall aid them in arresting him, thus limiting it to a time of peace, not only that the military authorities have the prior right to try him for the offense of which he is accused, but that they have the right to withhold him from the civil authorities and keep him in the army under all circumstances during the pendency of the war. It is clear, therefore, that under the articles of war as contained in section 1342, U. S. Rev. Stat., the civil authorities in time of war had no right to withhold a soldier accused of a crime from the military authorities, or to demand him from them in order to try him for an offense against the criminal laws of the land.

How does it stand under the act of August 29, 1916, in force at the time of the commission of the offense complained of? Thereunder article 96 takes the place of article 62 in the former statute, and article 74 of article 59. Though there is a change in verbiage, these new articles are substantially the same as the old ones. It is not important to take further note of them. The place of article 58 is taken by two sections in the new legislation. They are articles 92 and 93. Article 92 is in these words:

"Any person subject to military law who commits murder or rape shall suffer death or imprisonment for life, as a court-martial shall direct; but no person shall be tried by a court-martial for murder or rape committed within the geographical limits of the states of the Union and the District of Columbia, in time of peace."

Article 93 is in these words:

"Any person subject to military law who commits manslaughter, mayhem, arson, burglary, robbery, larceny, embezzlement, perjury, assault with intent to commit any felony, or assault with intent to do bodily harm, shall be punished as a court-martial may direct."

The offenses covered by article 93 are not limited to time of war, as in the former article 58, but the two covered by article 92 are. It will be noted, however, that in neither article is the provision that the offenses covered by them are "punishable" by court-martial; but in article 92 the provision is that the offender "shall suffer death or imprison-

ment for life as a court-martial may direct," and in article 93 that he "shall be punished as a court-martial may direct." Such language as this Mr. Justice Field in Coleman v. Tennessee seems to intimate might confer exclusive jurisdiction. It is therefore a question under the existing articles of war whether the military authorities do not in time of war have exclusive jurisdiction of the crime of murder, when committed by a person subject to military law, no matter where he may be when committed. It is not necessary that I take any position on this question. Assuming that the jurisdiction is no more exclusive than under article 58 of the former articles, the military authorities under article 92 have the preference in the exercise of jurisdiction.

[2] It is urged on behalf of the commonwealth of Kentucky that this preference has been waived by the military authorities. The action relied on as amounting to such waiver is the delivery of the prisoner to the jailer of Campbell county by the sergeant of his company, who arrested him, the delivery by his captain of the rifle with which the killing was done to the civil authorities, to be used as evidence against him, and the presence of his captain and a major, probably his major, at the examining trial, and their statement to the county judge who held the trial, when asked if they wanted him and were going to interfere, "Let the civil court attend to it," all of which took place on the day of the killing. To this it is sufficient to say that, assuming that the jurisdiction of the military authorities is not exclusive, but prior only, it has not been made to appear that these officers had any authority to waive the prior jurisdiction. The sergeant swears that he delivered the prisoner to the jailer to be held for the military authorities, and the action of the other officers was in view of the exercise of jurisdiction by the civil authorities, who had him in custody and after lapse of but little time for reflection. It cannot be said that presumptively they had authority to waive the prior jurisdiction of the military authorities, conceding that they intended to do so; and in the absence of a showing that they had such authority I cannot do otherwise than recognize such prior jurisdiction, when asserted by the commanding officer of the brigade to which the prisoner belongs.

My conclusion, therefore, is that if the Campbell circuit court will, in any contingency, have jurisdiction to try the prisoner under the indictment against him returned therein, it does not have such jurisdiction now, and that the military authorities are entitled to have him delivered to them, at least for trial under the charges pending before them against him.

An order will be entered to that effect upon the writ.